## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

MICHAEL L. VANCE,

      **Plaintiff,**

    v.

STATE OF NEW JERSEY DIVISION OF
LAW AND PUBLIC SAFETY, et al.,

      **Defendants.**

Civ. No. 12-4006 (KM)(MAH)

**OPINION**

## MCNULTY, District Judge

This is a civil rights action for damages under 42 U.S.C. § 1983, brought by Michael L. Vance against The State of New Jersey Division of Law and Public Safety ("Law Division"), the Division of State Police ("State Police"), and State Trooper Paul F. Kerrick. It comes before the Court on the motion (ECF no. 19) of the defendants for summary judgment, pursuant to Fed. R. Civ. P. 56. For the reasons stated herein, the motion will be granted.

### I.  Background

On December 22, 2011, Mr. Vance filed his Complaint in the Superior Court of New Jersey, Law Division, Sussex County. (SSX-L 879-11, ECF no. 1-1) Essentially, the complaint alleges that State Trooper Kerrick obtained an invalid warrant for Vance's arrest on charges of armed robbery of a convenience store. The supporting affidavit, Vance alleges, contained false information or omitted material information. In particular, he alleges that the statements of a witness, Robert Best, were deceptive, and that the police coerced Best into implicating Vance in the robbery. Count 1 alleges malicious

1

prosecution; Count 2 alleges abuse of process; and Count 3 generally alleges a violation of the plaintiff's "civil rights" without specifying a cause of action.

In State court, the defendants filed a motion to dismiss the complaint, and in the alternative for a more definite statement of the claims. The late Edward V. Gannon, J.S.C., granted the motion to dismiss the common law tort claims, based on N.J. Stat. Ann. § 59:8–3 (because the plaintiff had not filed a notice of claim), and N.J. Stat. Ann. § 59:2–10 (because public entities are not liable for malicious or willful torts). (Ex. B)[1]

---

[1]     "Ex. [letter]" as used herein refers to the Exhibits attached to the certification of counsel in support of the defendants' summary judgment motion. They are:

| | |
|---|---|
| Ex. A (ECF no. 19-2 at 5): | Complaint |
| Ex. B (ECF no. 19-2 at 10): | Order of Judge Gannon partially dismissing Complaint |
| Ex. C (ECF no. 19-2 at 15): | NJ State Police Investigation Report ("Investigation Report") (at 15), |
| | NJ State Police Supplemental Investigation Report ("Supplemental Report") (at 20), and |
| | Arrest Report (at 26) |
| Ex. D (ECF no. 19-2 at 31): | Statement of Jaipsakath Sheth |
| Ex. E (ECF no. 19-2 at 33): | Statement of Tom Pearsall |
| Ex. F (ECF no. 19-2 at 34): | DVD of Robert Best statement, under separate cover |
| Ex. G (ECF no. 19-2 at 36): | Search Warrant Affidavit of Trooper Kerrick |
| Ex. H (ECF no. 19-2 at 40): | Probable Cause Affidavit ("PC Affidavit") of Trooper Kerrick in support of issuance of criminal complaints and arrest warrants |
| Ex. I (ECF no. 19-2 at 43): | Search warrant |
| Ex. J (ECF no. 19-2 at 46): | Criminal Complaint (Vance) |
| Ex. K (ECF no. 19-2 at 49): | Criminal Complaint (Best) |
| Ex. L (ECF no. 19-2 at 51): | Promis Computerized report (Vance) |
| Ex. M (ECF no. 19-2 at 53): | Transcript of Deposition of Trooper Kerrick ("Kerrick Tr.") |

"Ex. [number]" as used herein, unless otherwise specified, refers to Exhibits 1–6, submitted by the plaintiff in opposition to the summary judgment motion. They are:

Ex. 1 (ECF no. 21-3 at 2) Affidavit of Michael L. Vance ("Vance Aff.")

On June 5, 2012, in response to the motion for a more definite statement, Vance filed a pleading stating that the Complaint (Count 3, presumably) was intended to assert a claim under 42 U.S.C. § 1983.[2] On June 28, 2012, defendants responded by filing a notice of removal, based on this Court's federal-question jurisdiction. (ECF no. 1 ¶ 3, citing 28 U.S.C. § 1331)

The matter has proceeded through discovery. On March 31, 2014, the defendants filed a motion for summary judgment.[3] (ECF no. 19; see Brief in support, "Def. Brf.", ECF no. 19-1.) Mr. Vance's original brief in opposition, now superseded, stated that discovery was incomplete, and sought to re-open discovery. In particular, he wished to locate a potential witness, Robert Best. (ECF no. 21 at 17–18) The defendants filed a Reply Brief. ("Def. Reply", ECF no. 22)

Some time went by without any further developments. On February 23, 2016, I administratively terminated the summary judgment motion without prejudice, and granted an additional 40 days for the plaintiff to locate and depose Mr. Best. (ECF no. 23) On April 18, 2016, I granted an additional 30-day extension for that purpose. (ECF no. 25)

| | |
|---|---|
| Ex. 2 (ECF no. 21-3 at 5) | Vance Interrogatory Answers, with |
| (Id. at 10) | Additional copy of PC Affidavit |
| (Id. at 12) | Handwritten statement of Robert Best |
| Ex. 3 (ECF no. 21-3 at 13) | Bureau of Corrections Arrest Card |
| Ex. 4 (ECF no. 21-3 at 15) | Affidavit of Jennifer L. Van Houten ("Van Houten Aff."), with |
| (Id. at 18) | Post Office receipt |
| Ex. 5a (ECF no. 21-3 at 19) | T. Pearsall statement |
| Ex. 5b (ECF no. 21-3 at 21) | T. Pearsall statement cont'd |
| Ex. 6 (ECF no. 21-3 at 23) | Grand Jury Report of Finding of No Bill |

[2]     Judge Gannon, after dismissing the common law claims, denied the motion for a more definite statement as moot in light of the clarification contained in the plaintiff's submission. (Ex. B, ECF no. 19-2 at 11)

[3]     On the docket, it is mislabeled as a motion to dismiss. (See ECF nos. 19, 20.)

On May 31, 2016, counsel for Mr. Vance wrote to the Court that the search for Mr. Best had been fruitless; the only information he had was that Best was "somewhere near Kentucky." Counsel requested the opportunity to draft and submit a revised response to the summary judgment motion. (ECF no. 26) I granted leave to submit a new, replacement responding brief (ECF no. 27), and plaintiff's counsel filed that new response a week later ("Pl. Brf.", ECF no. 28). It is apparent that the plaintiff continues to rely, however, on the declaration and exhibits he submitted with his original response. (ECF no. 21-3) I gave the defendants the option of resting on their previously-filed Reply Brief, or filing a new one. (ECF no. 29) The defendants opted to rest on their previously-filed Reply. (ECF no. 30; *see* Def. Reply, ECF no. 22.) The motion is thus fully briefed and ripe for decision.

## II.    Summary Judgment Standard

Federal Rule of Civil Procedure 56(a) provides that summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Anderson v. Liberty Lobby*, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505 (1986); *Kreschollek v. S. Stevedoring Co.*, 223 F.3d 202, 204 (3d Cir. 2000). In deciding a motion for summary judgment, a court must construe all facts and inferences in the light most favorable to the nonmoving party. *See Boyle v. County of Allegheny Pennsylvania*, 139 F.3d 386, 393 (3d Cir. 1998). The moving party bears the burden of establishing that no genuine issue of material fact remains. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23, 106 S. Ct. 2548 (1986). "[W]ith respect to an issue on which the nonmoving party bears the burden of proof ... the burden on the moving party may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325.

Once the moving party has met that threshold burden, the non-moving party "must do more than simply show that there is some metaphysical doubt as to material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 106 S. Ct. 1348 (1986). The opposing party must present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson*, 477 U.S. at 248; *see also* Fed. R. Civ. P. 56(c) (setting forth types of evidence on which nonmoving party must rely to support its assertion that genuine issues of material fact exist). "[U]nsupported allegations ... and pleadings are insufficient to repel summary judgment." *Schoch v. First Fid. Bancorporation*, 912 F.2d 654, 657 (3d Cir. 1990); *see also Gleason v. Norwest Mortg., Inc.*, 243 F.3d 130, 138 (3d Cir. 2001) ("A nonmoving party has created a genuine issue of material fact if it has provided sufficient evidence to allow a jury to find in its favor at trial."). If the nonmoving party has failed "to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial, ... there can be 'no genuine issue of material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Katz v. Aetna Cas. & Sur. Co.*, 972 F.2d 53, 55 (3d Cir. 1992) (quoting *Celotex*, 477 U.S. at 322–23).

## III.  Analysis

As noted above, the tort claims in Counts 1 and 2 were dismissed, leaving only Count 3, a federal-law claim under 42 U.S.C. § 1983. I first discuss (A) the defendants' amenability to suit under section 1983 generally; I then consider (B) the merits of the section 1983 claim, which seems to be brought under a theory of malicious prosecution or false arrest.

### A.  "Persons" Under Section 1983

I consider the defendants' amenability to suit under 42 U.S.C. § 1983. As a matter of law, the Law Division, the State Police, and Trooper Kerrick, in his

official capacity only, are not "persons" who may be liable under section 1983.[4] For the reasons stated in this section, the motion for summary judgment is granted as to those defendants; what remains is a section 1983 claim against Trooper Kerrick in his personal capacity.

> Section 1983 provides:

>> Every *person* who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . .

42 U.S.C. § 1983 (emphasis added).

A State is not a "person" amenable to suit under section 1983. *Will v. Michigan Dep't of State Police*, 491 U.S. 58, 67-70 (1989). Also barred are section 1983 suits for damages against "governmental entities that are considered 'arms of the state' for Eleventh Amendment purposes," which are "no different from a suit against the State itself." *Id.* at 70-71.

The Division of State Police is a State department or agency; as an "arm of the state," it is not amenable to suit as a "person" under § 1983. *See, e.g., Gonzalez v. Bobal*, No. CIV.A. 13-1148, 2015 WL 1469776, at *3 (D.N.J. Mar. 30, 2015) ("It is well settled that the New Jersey State Police is an arm of the state and thus not a person within the meaning of § 1983."); *Longoria v. New Jersey*, 168 F. Supp. 2d 308, 316 (D.N.J. 2001) ("[T]he Division of State Police is an arm of the state, and, as such, I conclude that it is not subject to suit under § 1983.").

---

[4] These defendants have waived their Eleventh Amendment federal-forum immunity by removing the action to federal court. That bar to subject-matter jurisdiction is therefore unavailable. Any other defenses that could have been asserted in a state court action, however, are not waived. *See Lombardo v. Pennsylvania, Dep't of Pub. Welfare*, 540 F.3d 190, 198 (3d Cir. 2008).

The Law Division, too, is a department of state government, and therefore is not a "person" for purposes of section 1983. *See Torrey v. New Jersey*, No. CIV.A. 13-1192 PGS T, 2014 WL 941308, at *6 (D.N.J. Mar. 11, 2014) ("Moreover, New Jersey and its state agencies are not considered "persons" for purposes of § 1983. [citing *Will, supra*]. Accordingly, Count One of Plaintiff's Amended Complaint is dismissed with prejudice insofar as it is asserted against the State of New Jersey, the Department of Law and Public Safety, and the DCJ."); *Druz v. Noto*, No. CIV.A.09-5040FLW, 2010 WL 2179550, at *4 n.9 (D.N.J. May 28, 2010) "[W]ith the exception of [a State Deputy Attorney General] in her personal capacity, all of Plaintiff's section 1983 claims ... are dismissed because Defendants [including the Law Division] are not "persons" within the meaning of section 1983."), *aff'd*, 415 F. App'x 444 (3d Cir. 2011).

Summary judgment is therefore granted to the Law Division and the State Police, and the Complaint is dismissed as against those two defendants.

I next consider Trooper Kerrick. The complaint is not specific about the capacity in which Kerrick is sued. I will assume that the plaintiff intends to sue Kerrick in both his official capacity and his individual capacity.

State officials sued in their official capacities, like state agencies, are not "persons" subject to a suit for damages under section 1983. *Will*, 491 U.S. at 71 n.10; *Kentucky v. Graham*, 473 U.S. 159, 167 n.14 (1985). An action against a State agent in that agent's official capacity is not considered an action against the person, but against the State itself. *Id. at* 165. To the extent the complaint is asserted against Trooper Kerrick in his official capacity, then, the complaint must be dismissed. *See Velez v. Fuentes*, No. CV156939MASLHG, 2016 WL 4107689, at *5 (D.N.J. July 29, 2016) (dismissing § 1983 claims against, *inter alia*, N.J. State troopers in their official capacities, because, "[n]either a state, nor its officials are 'persons' for the purposes of § 1983"); *Smith v. New Jersey*, 908 F. Supp. 2d 560, 564 (D.N.J. 2012) (citing *Will, supra*,

and *Hafer, supra,* and concluding that "Plaintiffs' § 1983 claims against [N.J. State] Trooper Rodriguez in his official capacity cannot proceed.").

Summary judgment is therefore granted on *Will*/"person" grounds, to the following extent: The Complaint will be dismissed as against the Law Division, the State Police, and Trooper Kerrick in his official capacity only.[5]

## B.    Probable Cause

That does not end the matter, however. A defendant named in his or her individual capacity remains amenable to suit under § 1983 as a "person." I

---

[5]    In a state court submission, Mr. Vance indicated that he intended to plead a cause of action under the New Jersey Civil Rights Act ("NJCRA"). *See* N.J. Stat. Ann. § 10:6–1. The NJCRA is modeled on Section 1983, and is construed in parallel with it. *See, e.g., Ingram v. Twp. of Deptford,* 911 F. Supp. 2d 289, 298 (D.N.J. 2012); *Trafton v. City of Woodbury,* 799 F. Supp. 2d 417, 443 (D.N.J. 2011).

Like Section 1983, NJCRA grants a cause of action against "a *person* acting under color of law." N.J. Stat. Ann. § 10:6-2 (emphasis added). As I have previously held, claims subject to dismissal on "person" grounds under § 1983 are therefore equally subject to dismissal under the NJCRA:

> The same sovereign immunity reasoning has been applied to claims for damages against the state and its entities pursuant to the NJCRA. *Szemple v. Corr. Med. Servs.,* 493 Fed. Appx. 238, 241 (3d Cir.2012); *Stroby v. Egg Harbor Twp.,* 754 F. Supp. 2d 716, 721 n. 5 (D.N.J.2010) (quoting *Chapman v. State of New Jersey,* Civ. A. No. 08–4130, 2009 U.S. Dist. LEXIS 75720, at *7, 2009 WL 2634888, at *3 (Aug. 25, 2009)). NJCRA is construed nearly identically to Section 1983. In particular, the definitions of "person" under the two statutes have been interpreted in parallel. *Didiano v. Balicki,* 488 Fed. Appx. 634, 638 (3d Cir. 2012) (explaining that "person" as defined in the New Jersey Code does not encompass the state or its functional equivalents).

*Endl v. New Jersey,* 5 F. Supp. 3d 689, 697 (D.N.J. 2014). *See also B.D. v. Bd. of Educ. of the Greater Egg Harbor Reg'l High Sch. Dist.,* 2015 WL 4508303, at *4 n.6 (D.N.J. July 24, 2015) (Hillman, J.) ("Both the NJCRA and § 1983 require that the party sued be a 'person' acting in their individual capacity, not in their official capacity.")

The dismissal of the § 1983 claims, then, would encompass any parallel claim under the NJCRA as well.

must therefore consider whether there is a genuine issue of material fact as to the section 1983 claims against Trooper Kerrick in his individual capacity.[6]

### 1. Malicious prosecution and false arrest under § 1983

Mr. Vance's complaint never clearly states the nature of his section 1983 cause of action. His brief in opposition to the summary judgment motion suggests that it rests on a theory of false arrest or malicious prosecution in connection with the filing of criminal charges and the arrest. At any rate, the only acts performed by Trooper Kerrick himself seem to have occurred in connection with investigating the charges and obtaining the arrest warrant. Here is Vance's statement of his claim in his brief:

> It is undisputed that Kerrick was acting under color of State law when he applied for an arrest warrant and search warrant, and filed criminal complaints against the Plaintiff. Consequently, the only question is whether Kerrick deprived the Plaintiff of his Constitutional rights, under the Fourth and Fourteenth Amendments to the United States Constitution.
>
> The underlying proposition is that filing criminal charges without probable cause, like an arrest without probable cause, is a Constitutional violation actionable under Section 1983." *Losch v. Borough of Parkesburg,* 736 F.2d 903, 907 (3d Cir. 1984) [*§ 1983 malicious prosecution action, alleging that criminal charges were filed without probable cause*]; *Patzig v. O'Neil,* 577 F.2d 841, 848 (3d Cir. 1978) [*§ 1983 claim of warrantless arrest without probable cause*].

(Pl. Brf. 9–10; [*bracketed*] case descriptions added.) I therefore, like the State, proceed on the assumption that this is a claim of false arrest or malicious prosecution based on Kerrick's alleged misstatements or omissions in the

---

[6] Although I have already dismissed the claims against the official State defendants, these merits-based grounds would also apply to them as an alternative basis for dismissal.

affidavit "when he applied for an arrest warrant . . . and filed criminal complaints against the Plaintiff." (Id.)[7]

"To state a [§ 1983] claim for false arrest or improper seizure under the Fourth Amendment, a plaintiff must establish: (1) that there was an arrest; and (2) that the arrest was made without probable cause." *Brown v. Mount Laurel Twp.*, No. CV 13-6455, 2016 WL 5334657, at *6 (D.N.J. Sept. 21, 2016) (citing *Groman v. Twp. of Manalapan*, 47 F.3d 628, 634 (3d Cir. 1995); *Dowling v. City of Philadelphia*, 855 F.2d 136, 141 (3d Cir. 1988)). *See also Berg v. Cty. of Allegheny*, 219 F.3d 261, 269 (3d Cir. 2000) ("The Fourth Amendment prohibits arrests without probable cause.") (citing *Orsatti v. New Jersey State Police*, 71 F.3d 480, 482 (3d Cir. 1995)). "A police officer may be liable for civil damages for an arrest if 'no reasonable competent officer' would conclude that probable cause exists." *Wilson v. Russo*, 212 F.3d 781, 786 (3d Cir. 2000) (quoting *Malley v. Briggs*, 475 U.S. 335, 341, 106 S. Ct. 1092 (1986)).

To state a § 1983 claim for malicious prosecution, a plaintiff must establish that "(1) the defendant [*i.e.*, the defendant in the civil § 1983 action] initiated a criminal proceeding; (2) the criminal proceeding ended in [the plaintiff's] favor; (3) the defendant initiated the proceeding without probable cause; (4) the defendant acted maliciously or for a purpose other than bringing the plaintiff to justice; and (5) the plaintiff suffered deprivation of liberty consistent with the concept of seizure as a consequence of a legal proceeding." *Halsey v. Pfeiffer*, 750 F.3d 273, 296–97 (3d Cir. 2014) (citing *Johnson v. Knorr*, 477 F.3d 75, 82 (3d Cir. 2007)).[8]

---

[7]   Although Vance's brief also refers to the obtaining of a search warrant, the basis for any challenge seems to be the same: *i.e.*, that probable cause to believe Vance guilty of an offense was lacking. The fruits of the search warrant, at any rate, did not lead to further charges; indeed, it was after execution of the search warrant that the grand jury no-billed the case.

[8]   The charge of armed robbery at issue here was no-billed by the State grand jury. (Ex. 6, ECF no. 21-3 at 23) Thus the "favorable termination" element is satisfied. I have not overlooked the fact that Mr. Vance was serving an eight-year prison term when he filed this action; that sentence, however, was imposed for an unrelated State CDS conviction. (ECF no. 21-3 at 8 ¶ 24))

The essential component of either theory—false arrest or malicious prosecution— is that the defendant seized the plaintiff or instituted a criminal proceeding against him without probable cause. "Probable cause exists whenever reasonably trustworthy information or circumstances within a police officer's knowledge are sufficient to warrant a person of reasonable caution to conclude that an offense has been committed by the person being arrested." *United States v. Myers*, 308 F.3d 251, 255 (3d Cir. 2002) (citing *Beck v. Ohio*, 379 U.S. 89, 91, 85 S. Ct. 223, 225 (1964)). That a criminal defendant was ultimately acquitted does not imply that the authorities lacked probable cause to arrest or charge him; in fact the disposition of the charges "is irrelevant to the probable cause analysis." *Wright v. City of Philadelphia*, 409 F.3d 595, 602 (3d Cir. 2005) (citing *Michigan v. DeFillippo*, 443 U.S. 31, 36, 99 S. Ct. 2627 (1979)); *see also Johnson v. Campbell*, 332 F.3d 199, 211 (3d Cir. 2003) (probable cause for arrest may have existed even if suspect did not actually commit crime).

In the case of a warrantless arrest, probable cause is assessed in relation to the facts possessed by the arresting officer at the time. *See Hunter v. Bryant*, 502 U.S. 224, 228, 112 S. Ct. 534 (1991). That simple false-arrest scenario is confounded, however, where, as here, the arresting officer was executing a warrant issued by a judge. An officer in possession of a warrant is to some extent shielded by the judicial officer's finding of probable cause to arrest. Still, a law enforcement officer may be liable, commonly on a malicious prosecution theory, where the officer improperly "influenced or participated in the decision to institute criminal proceedings." *Halsey*, 750 F.3d at 297. In such a case, a plaintiff attacking probable cause is really attacking the basis for the issuance of the warrant.

Here, that means attacking the information that Trooper Kerrick placed in the PC Affidavit upon which the judge issued the warrant. A judicial finding of probable cause may be subverted where an officer [1] "knowingly and deliberately, or with a reckless disregard for the truth, made false statements

or omissions that create a falsehood" and [2] "[s]uch statements or omissions are material, or necessary, to the finding of probable cause" for an arrest warrant. *Wilson,* 212 F.3d at 786–87.

The first element, deliberate or reckless falsehood, imposes some constraints on officers' reporting of information to a judge. In seeking a criminal charge or arrest warrant, officers may not rely on facts of which they had a "high degree of awareness of [their] probable falsity"—meaning that, "when viewing all the evidence, [they] must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information . . . reported." *Id.* Further, they are obligated to disclose known facts that "[a]ny reasonable person would have known . . . was the kind of thing the judge would wish to know" in making a probable cause determination. *Id.* As for the second element, materiality, the judge must determine whether the affidavit—as reconstructed, with inaccurate information excised and omitted information supplied—would have failed to establish probable cause. *Collins v. Christie,* 337 F. App'x 188, 194 (3d Cir. 2009) (citing *Wilson,* 212 F.3d at 789). This is known as a *Franks* analysis. *See Franks v. Delaware,* 438 U.S. 154, 98 S. Ct. 2674 (1978) (similar approach to analysis of statements in a search warrant affidavit).

There is no blanket rule, however, that all information, or even all potentially exculpatory information, must be presented to a judge who issues an arrest warrant. "We cannot demand that police officers relate the entire history of events." *Wilson,* 212 F.3d at 787. It is a question of context. "A common sense approach must be taken to the issue of probable cause and a determination as to its existence must be based on the totality of the circumstances." *Paff v. Kaltenbach,* 204 F.3d 425, 436, 2000 WL 222582 (3d Cir. 2000) (citations and quotations omitted).

## 2. Analysis of probable cause

Mr. Vance initially asserted that the statement of Robert Best, a witness who implicated him, was coerced by the police. As noted above, however, the necessary proofs have not materialized. Vance could not locate Best, despite the Court's reopening of discovery and grant of two extensions of time for that purpose. Permitted to revise his responding brief, he now stresses that probable cause was undermined by misleading statements or omissions in Trooper Kerrick's PC Affidavit in support of issuance of the arrest warrant.

I first **(a)** review the affidavit and supporting reports, and next **(b)** summarize the alleged misstatements. I then **(c)** consider those alleged misstatements in light of the two *Wilson* factors, deliberate or reckless falsehood, and consider whether they rise to a threshold level of materiality. Finally, I **(d)** perform a *Franks* analysis—that is, I consider whether the PC Affidavit, with any arguably material falsehoods corrected and omissions supplied, would nevertheless set forth probable cause.

### a.  *Affidavit and supporting reports*

On September 3, 2009, Trooper Kerrick swore out an Affidavit of Probable Cause ("PC Aff.", Ex. H, ECF no. 19-2 at 40) before the Hon. William J. McGovern, III, J.S.C. Based on that Affidavit, Judge McGovern issued criminal complaints and arrest warrants.

As is common, Trooper Kerrick's PC Affidavit incorporated the observations of other officers. (Indeed, Kerrick was not on duty on September 1, 2009, the date of the robbery, when the initial portion of the investigation took place.) Those other officers' observations, as well as Kerrick's own, are recorded in Investigation Reports. (Ex. C) Because Mr. Vance's claims are to some extent based on alleged discrepancies between the Investigation Reports and the PC Affidavit, I first review the Reports, and then summarize the Affidavit.

### Investigative Report and Supplemental Report

The first Investigative Report (Ex. C, ECF no. 19-2 at 15–19), signed by Trooper DeCarolis, states as follows:

Troopers DeCarolis and O'Keeffe responded to a report by Mr. Sheth of an attempted robbery of his store, Variety Central in Sussex, NJ. Sheth stated that the robber was a white male, approximately 5'7", in his mid-twenties, medium build, with short light brown hair and short facial hair.[9] His face was partially concealed with a white rag, and he wore a long-sleeved, khaki-colored shirt and blue pants. The robber, Sheth said, pointed a silver handgun at him and demanded money. When Sheth seemed to sound a silent alarm, the robber fled.

The troopers interviewed Tom Pearsall, who said he had seen the robber in the parking lot, apparently getting high, and then concealing his face with a white cloth. Before entering the store, the robber made a cell phone call. Pearsall saw the robber point a silver gun at the proprietor. Pearsall said the robber was in his mid-twenties, about 5'7", with a tan shirt and blue pants.[10] At the scene they also briefly questioned Robert Best, who denied any knowledge of the identity of the robber.

Troopers O'Keeffe and DeCarolis watched the surveillance video of the robbery several times. They confirmed that the robber was a white male and they familiarized themselves with his voice.

Canvassing the area, the troopers located a person who matched the description. That person, Mr. Vance as it turned out, was unshaven. He wore sunglasses, a white sleeveless shirt, blue athletic pants, and white sneakers. Trooper O'Keeffe believed that Vance's voice matched the one on the video.[11]

---

9       According to the BOC arrest card, dated September 4, 2009, Vance was 29 years old, male, race "w" with "fair" complexion, 5'8" tall, and 160 pounds. He is listed as having brown hair, blue eyes, and a medium build. (Ex. 3, ECF no. 21-3 at 14) That physical description is a fairly close match to the one given by Sheth.

10      The statement taken from Pearsall by the officer states that the robber had the white cloth over his mouth and nose while making the phone call, but that he then wrapped his whole face "kinda like a terrorist." (Ex. E)

11      A second person in the area appeared to match the description and was interviewed but released.

The Supplemental Report (Ex. C, ECF no. 19-2 at 20-25) was signed by Trooper Kerrick on September 10, 2009. It covers the investigation in the days following the robbery, September 2–8, 2009.

The Supplemental Report states the following:

On September 2, 2009, Kerrick, as well as Dets. Bostrom and McCooey, spoke to Robert Best. Best acknowledged that he regularly did odd jobs at the store, and was at the store both before and after the robbery. He stated that he did not know who the robber was, and volunteered to undergo a polygraph examination.

On September 3, 2009, Det. Tennant conducted a polygraph examination of Robert Best. The results indicated deception. Tennant and Kerrick confronted Best with those results and interviewed him further. Best then made a statement, as follows:

Best did not have a regular place to live. Approximately two weeks before he had stayed at Vance's apartment, along with Vance's girlfriend, Ms. VanHouten, and VanHouten's child.[12] At that time, Vance proposed that Best break into the store. On the morning of September 1, 2009, Best told Vance he would be out of the store running an errand at lunchtime, and Vance stated that today would be a good day.

Near lunchtime, as Best left the store, he encountered Vance. Vance was wearing a white t-shirt, jeans, and a tan long-sleeved shirt. Vance was "probably" wearing the tan shirt to hide his tattoos. When Best returned from his errand, he heard about the attempted robbery from Sheth.

Best told the police that he initially lied because he was afraid of Vance, who had told him he would be sorry if he told anyone about the robbery. Best stated that Vance "most likely" keeps a silver gun on the top shelf of his pantry in his apartment.

---

[12]     I refer to the apartment as Vance's home, and he did apparently live there. He states, however, that the apartment actually belongs to Jennifer L. Van Houten, who is his fiancée. (Vance Aff. ¶ 1)

Trooper Kerrick completed the PC Affidavit in support of criminal complaints and arrest warrants (Ex. H, PC Aff.), as well as an affidavit in support of a search warrant for Vance's apartment (Ex. G). Based on those affidavits, Judge McGovern issued the arrest and search warrants. (See Exs. I, J, K) Vance and Best were both arrested. The search of Vance's apartment did not yield a gun, but his cell phone was seized. The report states that the phone would later be examined to determine who Vance called before the robbery.

Kerrick's PC Affidavit

Trooper Kerrick's PC Affidavit (Ex. H, ECF no. 19-2 at 40–41) relates the following facts:

On September 1, 2009, troopers responded to the robbery complaint. Sheth advised that the robber was a white male approximately 5'7" tall and 22 years old, wearing a long tan colored shirt and blue jeans, with a white scarf wrapped around his face and head. The robber, according to Sheth, brandished a silver gun and demanded money.

An "independent witness" (apparently a reference to Pearsall) saw a man near the store with a cloth on his shoulder. The man spoke on the cell phone, tied the cloth around his nose and mouth, and entered the store.

At some unspecified time the officers received "information" that Best had knowledge of the robber.[13]

On September 3, 2009, Best was polygraphed by Det. Tennant in relation to his involvement in the robbery and found to be deceptive. Best was then interviewed further.

In that interview, Best stated that he regularly helps out at Mr. Sheth's variety store. Lately he had been homeless and had stayed at the residences of others, including Mr. Vance. Approximately two weeks before the robbery, Best and Vance had a conversation in Vance's yard. Vance suggested that Best could break into the store; Best declined. He also told Vance that the store did

---

[13]    The name of the source was kept confidential in the PC Affidavit. In his deposition, Kerrick named the source, a woman with whom Best has a child. (Kerrick Tr. 14:18–15:18)

not keep money overnight, but had the most money at lunchtime or at the end of the day. Vance said he would rob the store during the day by scaring Sheth with a silver handgun, which he displayed to Best.

On the morning of September 1, 2009, Best told Vance he would be leaving the store around lunchtime to run an errand. Vance replied in effect that "today is a good day." Around lunchtime, when Best left the store, he saw Vance nearby, by the Chase Bank. Vance was wearing a white t-shirt, a tan long-sleeved shirt, and jeans, a description consistent with those given by Sheth and the independent witness. Best believed that Vance probably wore the tan shirt to hide his tattoos. Best and Vance made eye contact as Best left to run his errand; when Best returned, he learned that Sheth had been the victim of a robbery attempt.

Best told the investigators that he initially lied because he was scared of Vance, who had warned him not to tell anyone or he would be sorry. Best said that Vance most likely keeps the silver handgun on the top shelf of the pantry in his home.

### b. Alleged misstatements

Defendants have usefully summarized and categorized Vance's initial contentions that Trooper Kerrick's PC Affidavit misstated or omitted important information. As a starting point, I consider that summary, which is as follows:

(1) [Kerrick] did not speak to the trooper who prepared the report on September 1, 2009; (2) he did not watch the video of the actual robbery; (3) he did not mention a person by the name of Van Houten; (4) he did not test Robert Best on the polygraph as to his statement implicating [Mr. Vance]; (5) he did not show a picture of Vance to the victim; (6) he did not find a gun when he searched [Vance]'s residence; (7) he confiscated [Vance]'s cell phone during the search but did not process it to determine the number the cell phone had called; (8) during the search of [Vance]'s residence, he did not find a long sleeve tan-colored shirt; and (9) he did not tell the judge how [Vance] was dressed on September 1, 2009, when State Troopers initially spoke to [Vance] after the robbery.

(Def. Reply at 4–5)

That summary, however, does not quite do justice to Vance's claims in his affidavits and revised responding papers. I therefore supplement the statement of alleged misstatements and omissions thus:

(10) The affidavits of Vance and his fiancée, Ms. Van Houten, state that, when he was confronted by police on the day of the robbery, he was not dressed as described in the police reports.

(11) Those affidavits also state that Vance has an alibi, *i.e.*, that at the time of the robbery he was in his apartment with his fiancée, playing with her child.

There is considerable doubt whether Kerrick's omission of these last two statements, which are contained in after-the-fact affidavits, was knowing or reckless. Giving the benefit of the doubt to these potentially material statements, however, I consider them in connection with the *Franks* analysis in Section III.B.2.d, *infra*.

        c.    *Deliberate or reckless falsehood/Materiality*

I discuss the alleged falsehoods or omissions as summarized above.

Before doing so, however, I make the following general observation. It is immediately apparent that many of these contentions do not relate to any misrepresentation or omission of any fact known to Trooper Kerrick. Rather, they are criticisms of the thoroughness of the investigation. Mr. Vance is saying, for example, that Kerrick should have ascertained the number called on Vance's cell phone, implying that something exculpatory would have been revealed, and that such hypothetical information, once uncovered, should have gone into the affidavit. Such a claim is of course very far removed from a claim that the affiant deliberately or recklessly misrepresented or omitted information.

Probable cause is inherently "accusatory," not "adjudicatory." *United States v. Williams*, 504 U.S. 36, 51 (1992) (prosecutor has no general constitutional duty to submit exculpatory evidence to grand jury). A malicious prosecution claim requires not a critique of the investigation, or a holistic

evaluation of all possible evidence, but rather an assessment of whether the fruits of the investigation amounted to a fair showing of probable cause.[14] I do not say that proof that an officer deliberately closed his eyes to material, existing exculpatory evidence would not be relevant—but here there is no such proof.

*Failure to interview Trooper DeCarolis before relying on his report.* It is of course true that Trooper Kerrick's PC Affidavit relied in part on the observations of other officers. Kerrick was not working on September 1, 2009 (Kerrick Tr. 7:3), and another officer prepared the first investigative report in connection with the investigation on that date. That Report itself was available to Kerrick, however, and the record demonstrates that Kerrick was briefed by another officer who worked the case on that date. (*E.g.*, Kerrick Tr. 8:3–20) Vance does not raise a hearsay objection, nor could he. "An affidavit or a complaint may be validly based on hearsay information." *United States v. Schartner*, 426 F.2d 470, 473 (3d Cir. 1970) (citing *United States v. Ventresca*, 380 U.S. 102, 85 S. Ct. 741 (1965)). There is no indication of any significant

---

[14]    *Trabal v. Wells Fargo Armored Serv. Corp.*, 269 F.3d 243 (3d Cir. 2001), usefully elaborated on these principles in the analogous context of an armored car company's investigation of an employee theft, resulting in criminal charges:

> [Plaintiffs] argue that [the investigator] was reckless in his investigation because he failed to investigate [the witness's] credibility, [the plaintiffs'] credit records, or interview *everyone* who may have possessed relevant information. However, the law does not require that a prosecutor explore every potentially exculpatory lead before filing a criminal complaint or initiating a prosecution. "The reasonable belief which constitutes probable cause does not require [a complainant] to evaluate the totality of circumstances both inculpatory and exculpatory, as a trier of fact guided by a reasonable doubt standard." *Carollo v. Supermarkets General Corp.*, 251 N.J. Super. 264, 597 A.2d 1105, 1108–09 (1991). "Probable cause does not depend on the state of the case in point of fact but upon the honest and reasonable belief of the party prosecuting," *Martinez v. E.J. Korvette*, 477 F.2d 1014, 1016 (3d Cir.1973), and "[n]o more is demanded than a well-grounded suspicion or belief," *J.L.W.*, 565 A.2d at 1112.
>
> Moreover, even if such meticulousness was required, nothing on this record establishes that any of those steps would have exculpated [the plaintiffs].

*Id.* at 250–51.

error of transmission, or any reckless or deliberate omission of any consequence. A threshold showing of materiality has not been made.

*Failure to review surveillance video personally.* It is also true that Trooper Kerrick did not personally view the surveillance video of the robbery. He was entitled, however, to rely on a fellow officer's viewing of the video "several times." To put it another way, the hearsay rule does not apply to affidavits in support of arrest warrants, and officers are entitled to rely on other officers' observations. That other officer observed that the perpetrator seemed to be a white male, and Kerrick reported the same in the affidavit. (Indeed, the PC Affidavit could have added that the officer thought the voice on the video was a match for Vance's voice.) There is no indication that Kerrick misrepresented the other officer's observations, which are described in the first investigative report (Ex. C). There is no deliberate or reckless omission apparent, and a threshold showing of materiality has not been made.

*Lack of a second polygraph.* Robert Best was polygraphed. The polygraph results indicated deception. When a detective confronted him with those results, Best confessed, implicating Vance and, to some extent, himself. Kerrick's PC Affidavit disclosed, accurately, that Best was polygraphed only once and was found deceptive. Vance's claim is not that there was a second polygraph, which Kerrick failed to reveal. Rather, he seems to be saying that Best *should* then have been polygraphed again, and that the hypothetically exculpatory results of that hypothetical second examination *should* have appeared in the PC Affidavit. That is a criticism of the investigation, not a claim of any misrepresentation or omission in the PC Affidavit. In any event, a polygraph is of no evidentiary value; it is at best a tool which may be used, as it was here, to confront a suspect. Once confronted, Best made his incriminating statement. There is no deliberate or reckless omission apparent, and a threshold showing of materiality has not been made.

*Failure to conduct a photo identification.* Mr. Vance faults Trooper Kerrick for failing to show a picture of him to a victim or eyewitness. Once again, this is

more in the nature of a criticism of the investigation, not a claim of falsehood in the PC Affidavit.

In the alternative, however, I consider the materiality of this contention. The robber's face was largely or entirely covered with a cloth, a fact that was before the judge. If a witness did not see the robber's face, there was no reason to conduct a photo identification. Nor would the judge have expected or desired the affiant to make the pointless observation that he did *not* conduct a photo ID. The affidavit contains no false statement or implication that any eyewitness did make a positive photo identification. I therefore find that this omission, if that is what it was, is immaterial. Its presence or absence would not in the least have altered the showing of probable cause in the PC Affidavit. A threshold showing of materiality has not been made.

*Failure to find gun in home.* Trooper Kerrick, it is true, did not state in the affidavit that his search of Mr. Vance's home failed to turn up a gun. But at the time he submitted the PC Affidavit, the search warrant had not yet been obtained, and the search had not yet been executed. (Kerrick applied for the search warrant at the same time he sought the arrest warrants.) There can be no deliberate or reckless omission of a fact not yet in existence. Its absence does not detract from the showing of probable cause. A threshold showing of materiality has not been made.[15]

*Failure to search contents of cellphone.* Likewise, Trooper Kerrick did not state in the affidavit that he had failed to search Vance's cellphone for the number Vance might have dialed on the date of the robbery. The phone, however, was seized after the issuance of the arrest warrant, in the course of the apartment search. (*See, e.g.,* Kerrick Tr. 24:7–11) Any facts about the

---

15      Nor did this create a duty to return to Judge McGovern and admit that "Best's information was false." (Ex. 2 ¶ 2, ECF no. 21-3 at 7) Best stated only that Vance "most likely" kept the gun on the top shelf of the pantry, and the standard for issuance of the warrant was probable cause, not certainty. The next opportunity for review of probable cause to charge Vance was the presentation to the grand jury, and the grand jury, presumably at least in part because of these post-arrest developments, declined to indict.

phone's contents could not have been known to Kerrick at the time of the PC Affidavit; they were not "omitted," recklessly or otherwise.

At any rate, there has now been full discovery. The plaintiff does not describe any specific piece of information that was or could have been recovered from the phone. Even now, there is no showing that anything on the phone would have exculpated (or for that matter inculpated) Vance. A threshold showing of materiality has not been made.

*Failure to find tan shirt.* Vance points out that the search of the Vance/Van Houten apartment did not turn up the long-sleeved tan shirt. Once again, the search had not been conducted at the time of the PC Affidavit, so the results of the search could not have been included.

*Tattoos.* Vance's counsel attacks Best's statement that he believed Vance might have worn the long-sleeved shirt to hide his tattoos. In the deposition, counsel asked Kerrick whether he "ever [found] out that Vance did not have any tattoos on his arms," and Kerrick answered "I couldn't tell you." (Kerrick Tr. 28:2–7) According to the arrest report, however, Vance has a tattoo of a shamrock on his left forearm (ECF no. 19-2 at 28), as well as a swastika on his abdomen, a tear drop on his right cheek, and a 765 and cross on his left shoulder (*id.* at 29).[16]

Nothing about those descriptions undermines Best's statement that Vance might have been wearing a long-sleeved shirt to cover tattoos, whether on his arms or shoulders. And of course counsel's question in Kerrick's deposition, which simply assumes that Vance has no arm tattoos, is not evidence of that fact; only a positive answer to that question would constitute evidence.

*Facial Hair.* Counsel implies that the PC Affidavit should have reported that Sheth's identification was unreliable because he said that Vance had facial hair. What Sheth said, according to the initial investigative report, was that the

---

[16]     The BOC Arrest Card submitted by Vance (ECF no. 21-3 at 14) notes a swastika chest tattoo and a teardrop under the right eye.

robber had "short facial hair." (Ex. C, ECF no. 19-2 at 17) The troopers who confronted Vance immediately after the robbery reported that he was "unshaven." (Ex. C, ECF no. 19–2 at 18). Counsel asserts that Vance had no facial hair, but his assertion rests solely on the Bureau of Corrections Arrest Card, dated September 4, 2009, which leaves the items for mustache and beard blank. (Ex. 3, ECF no. 31-3 at 14) Vance was arrested on September 3, 2009, two days after the robbery; this arrest card says nothing about whether he was unshaven on September 1, 2009. There is no significant discrepancy, and no evidence that Vance was actually clean-shaven on the day of the robbery.

*Robert Best Recantation.* Attached to Vance's interrogatory answers is a handwritten, undated statement, purporting to be a recantation by Robert Best. (ECF no. 21-3 at 12)[17] This I disregard. Vance has failed to locate Best, who is unavailable as a witness, and the handwritten statement itself is both unauthenticated and inadmissible as hearsay. *See* Fed. R. Civ. P. 56(c)(2) (summary judgment may be opposed on the basis "that the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence.") Nor is there any viable contention that it is admissible for a non-hearsay purpose; there is no evidence, for example, that Best's recantation was known to the police at the time the PC Affidavit was submitted; indeed, internal evidence implies that this recantation came later ("I lied to the detective Sorry.").

*Failure to incorporate Van Houten's alibi statements.* Trooper Kerrick did not personally speak to Ms. Van Houten, who allegedly would have furnished Vance with an alibi. Van Houten's name does not appear in the Investigative Report. Assuming that any such conversation with Van Houten occurred, there

---

[17]   It reads in its entirety:

   My name is Robert Anthony Best and all the things I said in the statement was a lie I was pressured and scarred I have never been in any situation like this. interigated and I lied to the detective Sorry.

      [signed] R. Best

23

is no evidence that Kerrick was aware of it. There is no evidence of circumstances that should have suggested to Kerrick that he could not rely on the report of his fellow officer. The only mention of this alleged alibi testimony in the record occurs in the affidavits later submitted by Vance.

I will assume *arguendo*, however, that this omission might be considered reckless and that a threshold showing of materiality has been made. I will evaluate it in connection with the *Franks* analysis. *See* Section III.B.2.d, *infra*.

*Vance's clothing and physical description.* Vance's counsel faults Kerrick's affidavit for failing to state accurately how Vance was dressed when troopers questioned him shortly after the robbery. The implication is that this description would have undermined Sheth's (or Pearsall's) description of the perpetrator. Actually, the trooper's description parallels those others fairly closely. Sheth said the robber was a white male, approximately 5'7", in his mid-twenties, medium build, with short light brown hair and short facial hair, and that he wore a long-sleeved khaki colored shirt, a round neck t-shirt[18] and blue pants. Pearsall said the robber was in his mid-twenties, about 5'7", with a tan shirt and blue pants.

Vance asserts that Kerrick "knew or should have known that officers who saw the plaintiff on the day of the attempted robbery determined that Plaintiff's appearance did not match the appearance of the perpetrator." (Ex. 2 ¶ 2, ECF no. 21-3 at 6) That is not what the officers said in their reports, however. When the troopers canvassed the area, they came across Mr. Vance, who was "unshaven and wearing sunglasses, a white sleeveless shirt, blue athletic pants and white sneakers." (Ex. C, ECF no. 19-2 at 19) This description is largely corroborative of the earlier ones. The "blue pants" are now "blue athletic pants"—a trivial discrepancy. The tan shirt is now missing. But it is not

---

18      Sheth's written statement says the robber was wearing a round-neck white t-shirt, and that his face was obscured by a "white color scarf." (Ex. D) The initial investigation report does not relate that Sheth described the robber as wearing such a t-shirt; according to the report, Sheth made the different observation that the white cloth obstructing the robber's face might have been a t-shirt. (Ex. C)

especially significant that the robber, seen later in the day, might have doffed the tan shirt (which, according to Best, was worn for purposes of disguise). And according to the officers, Vance was still wearing the blue trousers, as well as the white t-shirt. There is no significant discrepancy between this description and the earlier ones. Still less does its omission render Kerrick's PC Affidavit misleading and undermine probable cause. It is not material; its presence or absence in the PC Affidavit would not significantly affect the showing of probable cause.

What remain are the after-the-fact affidavits of Vance and his fiancée to the effect that, on the afternoon of September 1, 2009, he was not dressed as described by the officers. These set out at least a threshold showing of materiality, and I consider them, in the context of the earlier descriptions, in the *Franks* analysis. *See* Section III.B.2.d, *infra.*

d.    *Franks Analysis*

The final step is a *Franks* analysis. I must reconstruct the PC Affidavit, with knowing or reckless material misstatements and omissions corrected, and determine whether it would nevertheless set forth probable cause. I consider all of the alleged misstatements and omissions, at least for context, but concentrate on two:

1.    The affidavits of Vance and his fiancée, Van Houten, proffer an alibi. Vance and Van Houten state that they were together in their apartment playing with Van Houten's child from 12:30 p.m. to approximately 2 p.m. on September 1, 2009. (Vance Aff. ¶¶ 2, 7 (ECF no. 21-3 at 2–3))

2.    The affidavits of Vance and Van Houten state that, on the afternoon of September 1, 2009, he was not dressed as described by the officers, but was wearing "grey athletic pants, a black athletic tank top, and grey and white New Balance sneakers, and black sunglasses." (Vance Aff. ¶ 4, ECF no. 21-3 at 3; *see also* Ex. 4 ¶ 3, ECF no. 21-3 at 16.)

As stated above, neither the alibi nor the account of Vance's clothing appears in the Investigative Report on which Kerrick relied, and there is no suggestive evidence that he made any omission knowingly or recklessly. There is no evidence that Kerrick was even aware of these alleged facts, and the record contains no "red flags" that would have led Kerrick to distrust the report. But even taken at face value, this evidence would not have persuaded a reasonable reviewing judge that probable cause was absent.

Assume, then, that these denials of culpability by the accused or his fiancée had been included in the PC Affidavit. Both are highly biased witnesses whose testimony contradicts that of other witnesses. To be sure, one of those other witnesses, Best, was far from disinterested; he had an incentive to shift blame to Vance. Best, however, testified contrary to his own interest, implicating himself, and he had reason to know the facts he revealed. At any rate, the circumstances giving rise to Best's potential bias were before the state judge, who simultaneously signed a warrant for the arrest of Best. And probable cause, of course, does not require that the accused admit guilt; if so, it might rarely be found, and when found would be superfluous.

The alibi is not corroborated by objective evidence or other indicia of reliability. In support of the alibi, Van Houten attaches a receipt for a post office transaction. Even assuming that Vance was present in the post office (the receipt does not identify him), it does not provide an alibi. The transaction took place at the Sussex Post Office on September 1, 2009, at 12:01 p.m. It is not inconsistent with Vance's presence at the variety store when the robbery took place nearly an hour later, at approximately 12:57 p.m. (*See* Ex. D, Sheth Statement, ECF no. 19-2 at 31) I take judicial notice that the Sussex Post Office and Sheth's variety store are approximately ½ mile apart. On foot, Vance could easily have covered the distance in 11 minutes.[19]

---

[19]    I take judicial notice of these addresses as shown on Google Maps: https://www.google.com/maps/dir/United+States+Postal+Service,+455+NJ-23+%235,+Sussex,+NJ+07461/15+Mill+St,+Sussex,+NJ+07461/@41.2055599,-74.6086631,16z/data=!3m1!4b1!4m13!4m12!1m5!1m1!1s0x89c34000e93d052f:0x68a

Vance's claim to have been playing with a child in his apartment is similarly unsupported. A strong alibi would establish a suspect's presence at a remote location, ruling out his presence at the scene of the crime. Vance offers only a weak alibi. His alleged presence in the Vance/Van Houten apartment from 12:30 p.m. until 2 p.m. is hardly inconsistent with his presence at the robbery. The variety store and the apartment are a mere 1/10 of a mile, or a 3-minute walk, apart.[20] Inclusion of Vance's or Van Houten's alibi testimony in the PC Affidavit would not have ruled out Vance's participation in the robbery or induced the judge to withhold issuance of the arrest warrant.

Vance's claim that later in the afternoon he was wearing clothes that did not match the witnesses' description of the robber's clothing lacks any corroboration at all. That statement was as easy to make as it is difficult to refute, because it is not tied to any extrinsic evidence. But assume that the PC Affidavit had included the accused's contention that the investigating officers lied about his clothes. Even so, the affidavit would have set forth a sufficient finding of probable cause. When the facts are sufficient to sustain a charge, such credibility contests are for the finder of fact.[21]

---

190acb15a4d46!2m2!1d-74.6008587!2d41.2039567!1m5!1m1!1s0x89c34010ebf90ab3:0xbb9495227 1f5d835!2m2!1d-74.6089497!2d41.2082165?hl=en

[20]

https://www.google.com/maps/dir/15+Mill+St,+Sussex,+NJ+07461/26+Main+St,+Sussex,+NJ+07461/@41.2083615,-74.6104485,17z/data=!3m1!4b1!4m13!4m12!1m5!1m1!1s0x89c34010ebf90ab3:0xbb94952271f5d835!2m2!1d-74.6089497!2d41.2082165!1m5!1m1!1s0x89c3401055b220b7:0x2028f7f60c7bce6d!2m2!1d-74.607674!2d41.208794?hl=en

[21]     As to such discrepancies in alibi or identification information, *Wilson* itself is instructive. In *Wilson*, as in this case, the police officer and prosecutor simultaneously sought a search warrant and arrest warrant in connection with a robbery. After discussing a number of claims, the Court agreed with the plaintiff that there were three exculpatory facts that the affiant police officer "should have mentioned: (1) the robber was originally identified as someone 6'3" to 6'5", while Wilson is four to seven inches shorter; (2) one of the two victim-witness[es] with ample opportunity to view the robber failed to identify Wilson when shown a photo array; and (3) DaVila saw Wilson out in the shopping center when he was supposedly in the flower shop." 212 F.3d at 791. Those exculpatory facts came, not from the criminal suspect himself, but from

I have considered the statements in the Vance and Van Houten affidavits individually and in combination. I have, moreover, placed them in the setting of the other claimed omissions and inaccuracies, even if they did not individually rise to the level of materiality. *See* Section III.B.2.c, *supra.* I find that, under a *Franks* analysis, considered in isolation or together, they would not have defeated the showing of probable cause in the PC Affidavit.

Mr. Vance's challenge to the probable cause showing in the PC Affidavit is therefore rejected, and the motion for summary judgment on behalf of Trooper Kerrigan in his individual capacity is granted.

---

neutral witnesses. Nevertheless, considered in the context of the rest of the affidavit, they did not rise to the level of undermining probable cause. *Id.* at 792.

*Wilson* viewed the facts through the lens of qualified immunity. To overcome qualified immunity, a plaintiff must plead facts "showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd,* 563 U.S. 731, 735 (2011); *see also Pearson v. Callahan,* 555 U.S. 223, 236 (2009); *Saucier v. Katz,* 533 U.S. 194, 201 (2001).

The first step is self-explanatory. In the preceding section, I concluded that there is no sufficient evidence that there was a constitutional violation at all. That in itself is sufficient to require a finding that the officer is immune. *Wilson,* although it purported to apply a qualified immunity, stopped at step one; its analysis therefore added nothing to the substantive analysis of whether there had been a violation. *See* 212 F.3d at 792. In this case, we are in much the same position.

The second step requires "that in light of preexisting law, the unlawfulness of the official's conduct was reasonably and objectively apparent." *McGreevy v. Stroup,* 413 F.3d 359, 366 (3d Cir. 2005) (citing *Wilson v. Layne,* 526 U.S. 603, 615, 119 S. Ct. 1692 (1999)). *See also Hope v. Pelzer,* 536 U.S. 730, 739, 122 S. Ct. 2508 (2002). This step might implicate, *e.g.,* the prior analysis of whether Trooper Kerrick acted recklessly or with knowledge that Vance claimed he had an alibi or was not wearing the clothes as described. Like *Wilson,* I need not reach it.

On the alternative basis of qualified immunity, then, I would grant summary judgment in favor of Trooper Kerrick insofar as he is sued in his individual capacity.

## CONCLUSION

For the foregoing reasons, the defendants' motion for summary judgment is granted and the complaint is dismissed in its entirety. An appropriate order accompanies this opinion.

September 5, 2017

**KEVIN MCNULTY, U.S.D.J.**